jms

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KATIE LANE, | ) | |
| SARAH RICE and | ) | |
| RONALD JOHNSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 04-4079-JAR |
| | ) | |
| TODD F. SIMON and | ) | |
| STEPHEN E. WHITE, in their official and | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER AND OPINION GRANTING MOTION TO DISMISS

This matter comes before the Court on defendant Todd F. Simon and Stephen E. White's Motion to Dismiss (Doc. 12).  Defendants seek dismissal of plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  The motion is fully briefed and the Court is prepared to rule.  For the reasons stated below, the motion is granted.

### *Background*[1]

Plaintiff Katie Lane was the Editor in Chief for the *Kansas State Collegian* (the *Collegian*), a daily newspaper providing coverage of general news to the city of Manhattan, Kansas, and the surrounding community, including Kansas State University (KSU).  *Collegian* offices are located on the KSU campus and the newspaper is staffed by KSU students.  Plaintiff Sarah Rice was also an

---

[1]These background facts are taken from plaintiffs' Complaint.

editor of the *Collegian* in Spring 2004.[2]

The *Collegian* is published by Student Publications, Inc. (SPI).  For fifteen years, plaintiff Ronald Johnson held the offices of Treasurer and Director of Student Publications at SPI.  Johnson's SPI position is in addition to and separate from his employment as a KSU professor in the A.Q. Miller School of Journalism.  As Director of Student Publications, Johnson advised the student editors and reporters of the *Collegian*.  This role as adviser is intended and designed to allow the student editors to exercise and maintain control over the content of the newspaper.  Thus, in accordance with long-standing precedent, the Editor in Chief of the *Collegian* has final authority for publication content, and content decisions rest in the hands of student editors.

During the Spring 2004 semester, criticism arose on campus from student groups regarding the *Collegian's* lack of coverage of certain news events.  Two public forums were held on the KSU campus in which administrators, faculty and student leaders of campus groups met with *Collegian* editors.  A student led march through the KSU campus called for Johnson's removal from his position at SPI.

On May 7, 2004, defendant Todd F. Simon, the Chairman of the Board of SPI, wrote to defendant Stephen E. White, Dean of the College of Arts and Sciences at KSU, and recommended that Johnson not be reappointed as Director of Student Publications.  This recommendation was based, in significant part, on a content analysis of the *Collegian*.  The recommendation noted *inter alia* that:

> • "Johnson's actions and behavior in dealing with others as the representative of the corporation have been detrimental to the interests of Student Publications,

---

[2]The Court granted plaintiffs' oral motion to join Rice as a party plaintiff at the July 14, 2004 hearing on the preliminary injunction in this matter.

2

of the A.Q. Miller School, and of Kansas State."

- "News content has fallen below standards that are widely recognized in both professional and college newspapers."

- "For the period of time from the fall 2000 to the end of fall 2003, the sub par scope and quality of news coverage has been relatively consistent over time."

- "The Collegian's content is strikingly different from that of directly comparable student newspapers, looking much like a general interest newspaper rather than a campus publication," and

- "The Collegian, based upon the news story content of the past four years, has developed a culture where mediocre is acceptable.  The newspapers at peer schools, with advisers working under the same guidelines, appear to have different cultures that result in better news coverage."

In response to Simon's recommendation, White informed Johnson by letter, that effective May 24, 2004, Johnson would no longer serve as the Director of Student Publications.

Neither Simon nor White consulted the Board of SPI about Johnson's non-reappointment as Director of Student Publications.  The bylaws of SPI provide, however, that: "[i]n the case of split appointments between Student Publications and the A.Q. Miller School of Journalism and Mass Communications, the Board of Student Publications will be appropriately represented in all states of the search and evaluation process."  The bylaws also provide that meetings of the Board shall be held pursuant to notice from the corporate officer holding the position of Chairman that a majority of all Board members shall constitute a quorum, and that "effective action on any business shall be had only upon consent of a majority of all the members."

The Board of SPI challenged the non-reappointment of Johnson as Director of Student Publications.  By a resolution passed unanimously at a May 20, 2004 Board meeting, the Board noted

that it "does not approve of or consent to these attempts by persons or entities other than the Board to remove its Director of Student Publications by means other than by a majority vote of a quorum of the Board at any regularly scheduled or special meeting of the Board."  The Board also noted that if it chose to vote on the office of Director of Student Publications, a majority of a quorum of the Board would vote to retain Johnson.

Plaintiffs bring this action pursuant to 28 U.S.C. § 1983 alleging that defendants violated their First Amendment right to the exercise of freedom of the press by removing plaintiff from his position as Director of Student Publications and as a faculty adviser to students and reporters for the *Collegian* based on its content.  In addition, Johnson alleges that he has an equitable and contractual interest in the right and power of SPI to retain officers of its choosing.

Plaintiffs' Complaint seeks injunctive and declaratory relief.  Namely, plaintiffs seek a declaration by the Court that the *Collegian* and its student journalists have the right to exercise freedom of the press, free from interference by defendants; a declaration that Student Publications, Inc. has the right and power as a Kansas corporation to select and retain officers of its choosing; a declaration that the defendants' actions in reassigning Johnson are null and void, contrary to the by-laws of Student Publications, and *ultra vires*.  Plaintiffs also seek an order enjoining the defendants and other University officials from reassigning Johnson and from hiring a replacement for him, which would effectively reinstate Johnson because he was reassigned before the Complaint was filed; an order enjoining the defendants and other University officials from taking actions regarding the governance and operation of Student Publications, and specifically regarding the reassignment of Johnson's duties related to Student Publications; a temporary restraining order and a preliminary injunction granting the

4

aforementioned injunctive relief, and an order granting plaintiffs their attorney fees and costs.

*Discussion*

## 1.  Legal Standard

Defendant seeks dismissal of plaintiffs' case for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  A court may dismiss a claim for failure to state a claim upon which relief can be granted.[3]  Dismissal is appropriate only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.[4]  The purpose of Federal Rule of Civil Procedure 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true.[5]

On a Rule 12(b)(6) motion, a court judges the sufficiency of the complaint, accepting as true the well-pleaded factual allegations and drawing all reasonable inferences in favor of the plaintiff.[6]  The court construes the allegations in the light most favorable to the plaintiff.[7]  These deferential rules, however, do not allow the court to assume that a plaintiff can prove facts that it has not alleged nor that the defendants have violated the laws in ways that have not been alleged.[8]  If the facts narrated by the plaintiff "do not at least outline or adumbrate" a viable claim, the complaint cannot pass Rule 12(b)(6)

---

[3]Fed. R. Civ. P. 12(b)(6).

[4]*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (citation omitted).

[5]*Mounkes v. Conklin*, 922 F. Supp. 1501, 1506 (D. Kan. 1996) (quotation omitted).

[6]*Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir. 1987).

[7]*Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

[8]*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

muster.[9]  Dismissal is a harsh remedy to be used cautiously so as to promote the liberal rules of pleading while protecting the interest of justice.[10]

In this instance, both plaintiffs and defendants rely on matters outside the pleadings in their Rule 12(b)(6) briefs, such as the transcript from the preliminary injunction hearing.  It is well established that "[a] motion to dismiss for failure to state a claim upon which relief can be granted must be converted into a motion for summary judgment whenever the district court considers matters outside the pleadings."[11]  Courts have broad discretion in determining whether or not to accept materials beyond the pleadings.[12]  Reversible error may occur, however, if the district court considers matters outside the pleadings but fails to convert the motion to dismiss into a motion for summary judgment.[13]  None of the parties contend that the Court should convert the motion into one for summary judgment, and the Court therefore refuses to consider matters outside of the pleadings submitted by plaintiffs and defendants at this time.  Within its review of a motion to dismiss, however, the Court does consider documents attached to the complaint, as consideration of these documents does not convert a motion to dismiss into a motion for summary judgment.[14]

---

[9]*Mounkes*, 922 F. Supp. at 1506 (D. Kan. 1996) (citing *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988) (quotation omitted)).

[10]*Id.*

[11]Fed. R. Civ. P. 12(b)(6).

[12]5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (1990).

[13]*Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998); *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[14]*Riggs v. Boeing Co.*, 12 F. Supp. 2d 1215, 1216 n.3 (D. Kan. 1998) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991)); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).

## 2.  Analysis

Defendants seek dismissal of plaintiffs' Complaint on the grounds that: (1) plaintiffs lack standing to sue; (2) plaintiffs have not alleged a violation of their First Amendment rights; (3) the Eleventh Amendment bars plaintiffs' claims and (4) defendants are entitled to qualified immunity.  The Court addresses each ground in turn.

## A.  Standing

Those who seek to invoke the jurisdiction of the federal courts must satisfy the case-or-controversy requirement imposed by Article III of the Constitution.[15]  "Plaintiffs must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions."[16] To meet this standing requirement, a plaintiff must demonstrate that: (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision.[17]  "These three elements of standing are an indispensable part of the plaintiff's case and thus the plaintiff must support each element with the manner and degree of evidence required at the successive stages of the litigation."[18]

---

("When a complaint refers to a document and the document is central to the plaintiff's claim, the plaintiff is obviously on notice of the document's contents, and this rationale for conversion to summary judgment dissipates.").

[15]*Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Faustin v. City & County of Denver, Colo.*, 268 F.3d 942, 947 (10th Cir. 2001)).

[16]*Id.* (quoting *Lyons*, 461 U.S. at 101).

[17]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[18]*Ward*, 321 F.3d at 1266 (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)).

Defendants argue that Lane and Rice lack standing because neither are currently editors for the *Collegian*.  In addition, defendants argue that plaintiffs have not alleged a particularized, actual injury because the *Collegian* has continued to operate with independent editorial control, with full funding and available advisers.  The Court concludes that plaintiffs have standing because both Lane and Rice were editors of the *Collegian* during the Spring of 2004 when defendants decided not to reappoint Johnson as Director of Student Publications.  In addition, Lane and Simon have satisfied the injury requirement as the non-reappointment of Johnson resulted in the *Collegian* losing its adviser, and hence a particularized, actual injury to plaintiffs as editors of the paper.

Defendants additionally argue that Johnson lacks standing to bring his constitutional claim.  Under the facts presented in plaintiffs' Complaint, defendants assert that Johnson's First Amendment rights have not been affected by any actions of the defendants, such that he has not suffered an injury in fact.  The Court agrees.  Plaintiffs plead that:

> As Director of Student Publications, plaintiff Johnson advises the student editors and reporters of the *Collegian*.  This role as adviser is intended and designed to allow the student editors to exercise and maintain editorial control over the content of the newspaper.  Consistent with long-standing precedent, the editor-in-chief of the *Collegian* has final authority for publication content, and content decisions rest in the hands of student editors.

Because Johnson exercises no control over the content of the *Collegian*, his right to freedom of the press was not at all affected by his removal as adviser to the *Collegian*.[19]

---

[19]*See Romano v. Harrington*, 664 F. Supp. 675, 679 (E.D.N.Y. 1987) (holding that a plaintiff who served in an advisory capacity to a newspaper could not allege a violation of his First Amendment rights even if his dismissal was due to the content of the newspaper); *Moody v. Jefferson Parish Sch. Bd.*, 803 F. Supp. 1158, 1163 (E.D. La. 1992) (holding that a plaintiff's role in supervising publication of student newspaper "not independently protected by the Constitution" because plaintiff neither wrote nor edited the newspaper, but merely criticized the students' work).

**B. Violation of First Amendment Rights**

Defendants argue that plaintiffs' Complaint fails to contain allegations of acts or omissions that are actionable under 42 U.S.C. § 1983.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not create substantive rights, but rather provides a recovery mechanism for deprivation of a federal right.[20]  To establish a cause of action under § 1983, a plaintiff must allege (1) deprivation of a federal right by (2) a person acting under color of state law.[21]

For the same reasons that the Court concluded that Johnson lacked standing to bring a First Amendment claim, the Court similarly concludes that Johnson has not alleged deprivation of a federal right.  Johnson's non-reappointment as adviser to the *Collegian* simply did not implicate his right to freedom of the press.  In an apparent attempt to avoid dismissal, Johnson claims in his response brief that he has a constitutional right of association with others for purposes of engaging in activities traditionally protected by the First Amendment.  The Complaint, however, merely alleges that "[p]laintiffs have constitutional rights under the First and Fourteenth Amendments to the United States Constitution to the exercise of freedom of the press, free from interference by state actors."  The

---

[20]*Watson v. City of Kansas City,* 857 F.2d 690, 694 (10th Cir. 1988).

[21]*Id.* (citing *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)).

Complaint does not allege that Johnson's right to free association was violated, nor even mention this right.  Nor has Johnson attempted to amend his Complaint in accordance with Federal Rule of Civil Procedure 15.  Simply, the invocation of the right to freedom of association for the first time in Johnson's response brief is an impermissible attempt to amend his Complaint.

The Court also concludes that Lane and Rice have failed to allege a viable § 1983 claim.  Plaintiffs base their constitutional claim on the content analysis that led to Johnson's non-reappointment.  Plaintiffs imply that the content analysis performed by defendant Simon indicated that defendants had a problem with the specific content of the *Collegian*, such that Johnson's removal as adviser was a form of censorship which violated plaintiffs' right to freedom of the press.  In *Joyner v. Whiting*,[22] the Court summarized the principles governing the censorship of campus newspapers.  The Court stated:

> It may well be that a college need not establish a campus newspaper, or, if a paper has been established, the college may permanently discontinue publication for reasons wholly unrelated to the First Amendment.  But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment.[23]

The exhibits relied upon by plaintiffs and attached to plaintiffs' Complaint establish that Johnson's non-reappointment was not due to the *Collegian's* coverage or lack of coverage of certain issues, but rather was due to reasons wholly unrelated to the First Amendment.  Exhibit 4 to the Complaint contains Simon's content analysis, which plaintiffs really upon so heavily.  Simon explains

---

[22]477 F.2d 456 (4th Cir. 1973).

[23]*Id.* at 460; *see also Stanley v. Magrath*, 719 F.2d 279, 283 n.6 (8th Cir. 1983) ("As far as the First Amendment is concerned, the University could certainly choose not to own or support any newspapers, so long as its motivation is permissible.").

that "[c]ontent analysis is a technique used by social scientists, particularly in the mass communications

fields, to precisely measure specific aspects and characteristics of media content.  It is designed to

provide objective, testable and verifiable measures that will allow for generation."  In this instance,

Simon compared the total bylined items, the number of news stories, the number of feature stories, the

percentage of campus stories, the number of sources per story, the number of sports stories, the

number of bylined opinion items, and the number of diversity items in six campus newspapers

comparable to the *Collegian*.

> The content analysis performed by Simon thus had nothing to do with the particular stories

appearing in the *Collegian*.  Rather, the analysis reflected that the overall quality of the *Collegian* was

far inferior to comparable campus papers.  Indeed, Simon concluded that "[t]he news product that has

been presented by the *Collegian* in recent years does not represent sound journalistic practice.  News

content has fallen below standards that are widely recognized in both professional and college

newspapers."  Plaintiffs basically admit that the so-called "content" issues defendant Simon referenced

were in reality quality issues by pleading that: "The *Collegian's* national recognition and awards for

excellence in student journalism fly in the face of and contradict defendant Simon's content based-

analysis on which he based his recommendation for termination of plaintiff Johnson as Director of

Student Publications and as adviser to the *Collegian*."[24]

> In addition to recommending that Johnson not be reappointed on the basis of the content

analysis, Simon also relied upon Johnson's actions and behavior in dealing with others as the director of

---

[24]The Court notes that although the validity of the content analysis may be relevant to Johnson's
employment claim, it is irrelevant to a § 1983 claim that defendants' violated plaintiffs' First Amendment rights.

Student Publications and adviser to the *Collegian*.  Simon noted that:

> Johnson's personal and professional conduct as adviser deserves reproach.  He has
> failed in his duty to be a role model for student staff members by fostering conflict and
> isolation at the *Collegian* rather than working to resolve problems and consider
> differences of opinion.  His interpersonal dealings with others in the school and
> university community may safely be deemed turbulent and often adversarial.

Much like the analysis of the *Collegian's* overall quality, the removal of Johnson based upon his

attitudinal shortcomings does not implicate the First Amendment rights of Lane and Rice.

Lastly, plaintiffs also imply, without any supporting factual allegations, that Johnson was not

reappointed as adviser to the *Collegian* because of the complaints surrounding the lack of diversity

coverage.  Plaintiffs note that the associate provost for diversity and dual-career development stated

publicly that Johnson should be removed because of the lack of diversity coverage.  Yet, the associate

provost is not a defendant.  No similar allegations are attributable to defendants Simon or White.

Rather, defendant Simon's recommendation not to reappoint Johnson expressly states: "My

recommendation is not based on the recent controversy regarding the amount of coverage of diversity

and minority news in the *Collegian*."  Although Simon found that "the data available did indicate that

there was a problem with diversity coverage and that the problem had existed for a period of time . . . it

did not establish that Johnson's work as adviser to the paper was the reason for the lack of diversity

coverage in the *Collegian*."  Thus, assuming *arguendo*, that the allegations in plaintiffs' Complaint and

attached exhibits are true, the Court cannot conclude that Johnson was not reappointed because of the

content of the *Collegian*.  Consequently, the Court concludes that Lane and Rice's First Amendment

rights were not implicated by the non-reappointment of Johnson.

13

Nor are there any factual allegations in the Complaint that defendant White's ultimate decision not to reappoint Johnson as Director of Student Publications and adviser to the *Collegian* was based upon the particular content appearing in the paper. Rather, defendant White stated that his decision, which was also made an exhibit to plaintiffs' Complaint, "concurs with the recommendation of Dr. Simon." Defendant White reiterated that Simon's recommendation was based upon "the vote of the tenured faculty, unsatisfactory advising, lack of quality news coverage in the *Collegian*, and concerns about [Johnson's] conduct of relationships with individuals and organizations both on and off campus." There are simply no factual allegations to support Lane and Rice's claim that the removal of Johnson was due to the stories appearing in the *Collegian* and, thus, that as editors of the paper, their First Amendment rights to freedom of the press were implicated.

The Court also must address plaintiffs' argument that Farrell Webb, a faculty member at KSU, pressured the *Collegian* to cover a program targeted at minorities. This argument appears in plaintiff's Supplemental Response and Memorandum in Opposition to Defendants' Motion to Dismiss (Doc. 21). At the outset, the Court notes that the Response is akin to a sur-reply which is not contemplated under District of Kansas local rules.[25] The courts in this district do not permit a sur-reply without leave of the court, and reserve leave for rare circumstances as "where a movant improperly raises new arguments in a reply."[26] As plaintiffs have provided no basis for the filing of the sur-reply, it is unauthorized and may be disregarded. More fundamentally, though, the argument regarding Webb is totally irrelevant to plaintiffs' Complaint, which alleges that Simon and White interfered with plaintiffs' right to free exercise

---

[25]*See* D. Kan. Rule 7.1(c) (contemplating only a response and a reply).

[26]*Harnett v. Parris*, 925 F. Supp. 1496, 1500 (D. Kan. 1996) (citations omitted).

of the press by not reappointing Johnson.  In addition, plaintiffs have not sued Webb, nor attempted to amend the Complaint to include Webb as a defendant.  Thus, even if the Court were to consider these new allegations, they do not save plaintiffs' Complaint from dismissal.

Because plaintiffs have not pled that they were deprived of any rights secured by the Constitution, the Court must dismiss plaintiffs' § 1983 claims.  Plaintiffs may have a claim stemming from defendants' failure to follow the policies of the Board of SPI.  Plaintiff Johnson may well have a viable claim for breach of his employment contract.  However, neither of these claims implicates a federally protected right.  The Court is thus without federal question jurisdiction.

When a Court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over a state law claim.[27]  When deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.[28]  In this case, the remaining claims raise questions of state law.  This case is additionally in the early stages and discovery was stayed some time ago pending resolution of the instant motion to dismiss.  Consequently, the Court finds no reason to exercise supplemental jurisdiction over the remaining claims.

## C.  Sovereign Immunity

The Eleventh Amendment states that "[t]he judicial power of the United States shall not be

---

[27]*See* 28 U.S.C. § 1367(c)(3); *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138-39 (10th Cir. 2004); *cf. United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").

[28]*Gold v. Local 7 United Food & Commercial Workers Union*, 159 F.3d 1307, 1310 (10th Cir. 1998), *overruled on other grounds by Styskal v. Weld County Comm'rs.*, 365 F.3d 855 (10th Cir. 2004).

construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[29]  The Supreme Court has repeatedly explained that the amendment confirms the historically-rooted understanding of sovereign immunity, which is that federal jurisdiction over suits against unconsenting states–even by its own citizens–"was not contemplated by the Constitution."[30]  There are three primary methods, however, in which a plaintiff can circumvent the Eleventh Amendment.[31]  First, a state may consent.[32]  Second, congress may clearly and expressly abrogate the state's immunity.[33]  Third, a party may sue a state official pursuant to *Ex parte Young*.[34]  In the instant action, plaintiffs rely on the *Ex parte Young* doctrine.

Under the *Ex parte Young* doctrine, the Eleventh Amendment generally does not bar a suit against a state official in federal court which seeks prospective equitable relief for violations of federal law, even if the state is immune from suit.[35]  The reasoning behind the *Ex parte Young* doctrine is that if an official has performed his duties in a way that contravenes either the Constitution or a federal law, he does so outside the cloak of state authority, thus a suit against him does not impact the State in its

---

[29]U.S. CONST. amend. XI.

[30]*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)).

[31]*J.B. v. Valdez*, 186 F.3d 1280, 1285-86 (10th Cir. 1999) (citation omitted).

[32]*Id.* at 1286 (citation omitted).

[33]*Id.* (citation omitted).

[34]*Id.* (citation omitted).

[35]*Id.* (citation omitted).

sovereign or governmental capacity.[36]  The doctrine is narrow; it requires that there "be an ongoing violation of federal law" and that it apply "only to prospective relief" and not "to obtain a declaration that a state officer has violated plaintiff's federal rights in the past."[37]

In this case, there are at least three reasons why the *Ex parte Young* doctrine is inapplicable. First, plaintiffs have not stated a violation of federal law.  While this prong of *the Ex parte Young* analysis does not require the Court to ascertain whether state officials actually violated federal law, plaintiffs must still state a non-frivolous, substantial claim for relief against the State officers that does not merely allege a violation of federal law "solely for the purpose of obtaining jurisdiction."[38]  As already discussed, plaintiffs have not alleged a viable claim for relief under § 1983.  Nor have plaintiffs pointed to any other violations of federal law.  Since plaintiffs have failed to even allege a violation of federal law, plaintiffs certainly fail to properly plead the requisite "ongoing violation of federal law."

In addition, plaintiffs request retrospective, rather than prospective relief.  Plaintiffs couch their relief in prospective terms by seeking declaratory and injunctive relief.  Yet, the requirement that the relief sought be permissible prospective relief is "not a game of semantics."[39]  The overriding question is whether the relief will remedy future rather than past wrongs.[40]  A close look at plaintiffs' Complaint indicates that they seek to remedy past wrongs, namely the non-reappointment of Johnson as adviser to

---

[36]*Chaffin v. Kansas State Fair Board*, 348 F.3d 850, 866 (10th Cir. 2003).

[37]*Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 495 (10th Cir. 1998).

[38]*Chaffin*, 348 F.3d at 866.

[39]*Id.* at 867 (quotation omitted).

[40]*Id.*

the *Collegian*, which allegedly implicated Lane and Rice's right to free exercise of the press.  Plaintiffs

ask the Court to declare that Johnson's removal was unlawful and reinstate Johnson's employment in

order to vindicate his rights and ensure that the *Collegian* operates independently of the defendants.  In

this way, plaintiffs seek to impermissibly vindicate past alleged constitutional violations, rather than to

remedy any future wrongs.  Consequently, Eleventh Amendment immunity provides another reason why

plaintiffs' claims against defendants in their official capacities must be dismissed.

**D.  Qualified Immunity**

Lastly, defendants urge that they are entitled to qualified immunity.  Because the Court has

already determined that plaintiffs entire suit must be dismissed for lack of a viable federal claim, the

Court declines to consider this additional ground for dismissal.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motion to Dismiss

(Doc. 12) is GRANTED.

**IT IS SO ORDERED**.

Dated this 2nd  day of June 2005.

 S/ Julie A. Robinson

Julie A. Robinson

United States District Judge

18

*Memorandum Order and Opinion Granting Motion to Dismiss*

19